### JORDAN v. ORTLIEB et al.
### No. 1150.

Court of Appeal of Louisiana. First Circuit.
May 22, 1933.

Smith, Albritton & Hardin, of Baton Rouge, for appellant.

D. J. Sanchez, of Baton Rouge, for appellees.

Le BLANC, Judge.

Plaintiff, W. T. Jordan, aged fifty-five years, was hit by an automobile belonging to R. A. Ortlieb, being driven at the time by his negro porter, Junius Hudson, on North street in the city of Baton Rouge, at about 7:30 in the evening of January 30, 1932. Mr. Jordan was crossing North street on foot, from north to south in the middle of the block between North Twentieth (formerly Gaines) and Dufrocq streets. Hudson was driving west on North street. The impact took place about the center of the street, the left front fender of the automobile knocking Jordan to the pavement and causing him to suffer severe injuries. He instituted this suit for damages against Hudson, the driver of the car, and against Ortlieb, the owner. Hudson is charged with negligence in driving the automobile at an immoderate and excessive rate of speed, in violation of the traffic ordinance of the city of Baton Rouge, in not keeping proper lookout, and in swerving the car from his right-hand side to the left when he had ample space to pass on the right. It is also alleged that the brakes on the automobile were not in good mechanical condition. Ortlieb, Hudson's employer, is sought to be held under the doctrine of respondeat superior.

The answer of each defendant amounts practically to a general denial of the negligence alleged against Hudson and of his alleged agency at the time of the accident. They both, as an alternative, plead contributory negligence on the part of plaintiff.

The lower court rendered judgment in favor of both defendants, dismissing and rejecting the plaintiff's demands, and the latter has appealed.

It was on a Saturday night that this accident occurred. North street is an important thoroughfare in the city of Baton Rouge, and the testimony is convincing that there were automobiles parked on both sides in the block at the point where plaintiff was attempting to cross. His version of the accident is that he had just emerged from North Twentieth street and turned to his right on North street. He was therefore walking west on the north side of that street. On reaching the middle of the block, he thought of cigarettes which he wanted to purchase from a wholesale tobacco store right across the street and he started to cross over. Although he insists that he did not enter the street from between parked automobiles as the defendants aver he did, he nevertheless admits that he was not crossing the street at a corner, but at about the middle of the block. He says that as he stepped from the curb he saw a car coming from the east, practically a block away; that he walked hurriedly. "I wanted to go to the store and get to the barber shop," he says. When he was "just past the middle of the street" he looked again and saw the same car fifty or sixty feet away. Then, his testimony is that after he passed the center of the street, he looked to his right, which would be to the west, saw no car, and continued on. "Just as I continued on" he says "something hit me."

Whilst the exact width of the street is not given, there is testimony to the effect that it is as wide as the usual street. Our observation from cases coming before us from the city of Baton Rouge is that the average street is thirty feet wide. If, as plaintiff says, he was "just past the middle of the street," which placed him, no matter how little, south of the center, when he saw the automobile fifty or sixty feet away, and if, as he says also, he was walking hurriedly, it is rather difficult, if not impossible, for us to understand how he could have been struck about the center of the street or a little south of center. It would seem that by the time that car would have traveled those fifty or sixty feet, he would have been entirely across or nearly across the street. His explanation, of course, is that the automobile was coming at a very rapid speed. It would have been necessary for it to have been going at a terrific rate to have gone those fifty or sixty feet and strike him at the spot where he himself says he was struck in the street. Considering the width of the street and that he was beyond the center, there were consequently less than fifteen feet left between him and the curb on the south side. When asked about how far from the center of the street he was struck, he says about six feet from a car that was parked on the south side. Allowing a distance of five feet between the curb and the extreme left side of that parked car, and adding to that the six feet he gives as the distance he was from it, we have eleven feet to take off of the entire fifteen, leaving as the maximum only four feet from the center. If he was past the center, of course, it was less than four feet. To say that that car traveled fifty or sixty feet while Mr. Jordan covered only four, the time it took to make barely two steps, is most improbable. It would have had to be going at more than fifty miles an hour, and there is certainly nothing in the record to suggest that Hudson was driving at such speed. The physical facts, on the contrary, tend to corroborate his testimony that he was

going between fifteen and eighteen miles, as will be shown in discussing them.

Hudson says that he was driving on his right-hand side of North street, going west. When he was about fifty or sixty feet from the place where he ran into Mr. Jordan, a lady stepped from the north sidewalk of the street and started across. To avoid striking her he "cut around her," meaning, we take it, that he passed to the left of her, and as he pulled back over to his right-hand side of the road, Mr. Jordan appeared before him, running, he says, from between two of the parked cars on the north side of the street. At that moment he was about five or six feet from him. He applied his brakes at once and cut further to his right, but could not avoid striking him. It is not disputed that it was the left front fender of the car that struck the plaintiff, a fact which gives some support to Hudson's version of the accident. When he refers to Mr. Jordan as "running" between the parked cars, his statement is not at much variance with the plaintiff's own testimony that he was walking "hurriedly." Hudson says that the collision took place about the center of the street, probably a little on the north side of center. Plaintiff also says it was about center, but to the south. At any rate, the difference between them with regard to the exact point is so small as to be immaterial. On applying his brakes, Hudson brought the car to an almost immediate stop. He says within five or six feet from where he struck plaintiff. A witness for plaintiff, named Tullier, says it was about ten feet. A stop even in ten feet is a physical fact corroborative of Hudson's estimate of his speed of fifteen to eighteen miles. Another fact which such a stop tends to prove is that the brakes on the automobile were in good working order. In this connection, also, it might be remarked that the testimony, moreover, is that on the very same afternoon, shortly before the accident, the car had been to a mechanic for attention and the brakes had been inspected and adjusted.

Plaintiff and the negro boy Hudson were the only eyewitnesses to the accident. Tullier, who has already been referred to as a witness for plaintiff, was seated in his automobile which was parked on the north side of North street about twenty or twenty-five feet from the corner of North Twentieth or Gaines street. He did not see the accident but heard the noise made by the application of the brakes on the Ortlieb car, and when he looked Mr. Jordan had already been struck and was lying in the street next to the car that was parked near the United States Café on the south side of the street. We do not find his testimony to be a bit unfavorable to the defendants and in many instances he corroborates what Hudson testified to.

Immediately after Hudson stopped his car he picked the plaintiff up and took him to Mr. Ortlieb's to tell him about the accident. Later, they took him to the Baton Rouge General Hospital, where he was attended to by Dr. Johnston. In talking about the accident with Dr. Johnston, plaintiff exonerated the negro entirely and said that he himself was at fault. A traffic officer by the name of Cross, who had followed them to the hospital to investigate the accident and arrest the driver of the car if necessary, heard Jordan say that it was not the negro's fault and asked the officer not to put him in jail. He made similar remarks repeatedly afterwards to Mr. Ortlieb, and on one occasion repeated the same thing to him in the presence of three witnesses. It is urged that these statements testified to by Mr. Ortlieb should not be considered seriously as he is a defendant in the case, and that the witnesses who say they heard them are three of his employees whose testimony may be said to be favorable to him. Were we to disregard Ortlieb's and these three witnesses' testimony on this point entirely, we still have Dr. Johnston's to consider, and certainly there isn't the least intimation that he was moved by any other desire than to tell the truth. In trying to explain away his testimony and discredit it, counsel argue that when plaintiff made that statement to Dr. Johnston, it was right after he was taken to the hospital and he was not in full possession and control of his mental faculties. Dr. Johnston, however, says that he was perfectly normal, mentally. Besides, plaintiff admits that at the same time the statement attributed to him by Dr. Johnston was made, he interceded with Officer Cross not to arrest the boy as it would do him (plaintiff) no good to have the negro sent to jail. It is rather difficult to reconcile plaintiff's position that at one and the same moment he could readily have exercised his mental faculties to plead in behalf of the boy for the very good reason that he gave, and on, the other hand not be able to control those same faculties when he was admitting that the accident was caused by his own fault and the boy was not to blame.

Numerous authorities have been cited by counsel for plaintiff, all of which we have examined. We find none applicable, however, under the facts as we hold them to be in this case. Plaintiff has not supported any of the charges of negligence alleged against the driver of the car. This he had to do before he could seek to hold the owner, his employer, under the rule of respondeat superior.

The lower court correctly rejected the demands of the plaintiff and dismissed his suit.

Judgment affirmed.